AL:NS/ALC
F. #2015R00206

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **15M 747** |

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JAMES CURETON,
    also known as "Jayquan" and "Q,"

              Defendant.

- - - - - - - - - - - - - - - - -X

AFFIDAVIT IN SUPPORT OF
APPLICATION
FOR ARREST WARRANT

(18 U.S.C. § 924(j))

TO BE FILED UNDER SEAL

EASTERN DISTRICT OF NEW YORK, SS:

        PHILIP KEANE, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law and acting as such.

        On or about October 31, 2009, within the Eastern District of New York and elsewhere, the defendant JAMES CURETON, also known as "Jayquan" and "Q," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: use of a firearm during and in relation to a drug trafficking crime, to wit: a conspiracy to distribute and possess with intent to distribute (a) a substance containing heroin, a Schedule I controlled substance; and (b) a substance containing cocaine, a Schedule II controlled substance, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111(a),

in that the defendant, together with others, with malice aforethought, did unlawfully kill Raymond Brooks willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2, and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent assigned to the violent gang investigation squad of the Federal Bureau of Investigation ("FBI"). During my tenure with the FBI, I have been involved in numerous cases involving racketeering, murder, firearms, robbery and narcotics investigations and prosecutions. In the course of those and other investigations, I have conducted physical surveillance, supervised or participated in undercover transactions, executed search warrants, debriefed cooperating witnesses and confidential informants, reviewed taped conversations, and secured other relevant information using other investigative techniques.

2. I have personally participated in the investigation of the offense discussed below. I am familiar with the facts and circumstances of this investigation set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and information obtained from witnesses and from reports and notes of other law enforcement officers involved in the investigation.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

3

knowledge through others. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. According to reports from the Albany County Police Department, on October 31, 2009 at approximately 3:19 p.m., a police officer responded to the basement apartment at 181 Eagle Street in Albany, New York and there found Raymond Brooks ("Brooks") dead on the living room floor. According to the autopsy report, Brooks had sustained one gunshot wound to his head, which killed him instantaneously, and one gunshot wound to his neck.

5. An individual who has been cooperating with the government ("CW-1") has advised the following, in sum and substance and in part, regarding Brooks' murder[2]:

    a. In or about 2009, CW-1 participated in a conspiracy to distribute narcotics including cocaine and heroin with the defendant JAMES CURETON ("defendant CURETON"), Raymond Brooks and others in Staten Island, New York and Albany, New York. In approximately September 2009, CW-1 provided Brooks with a quantity of narcotics including at least approximately one kilogram of cocaine on consignment for Brooks to sell in

---

[2] CW-1 has pled guilty to two federal offenses -- the drug-related murder of Raymond Brooks and a conspiracy to distribute cocaine base -- and has not yet been sentenced. CW-1 also has committed, and in some cases been convicted of, additional offenses including, for example, crimes of violence such as murder conspiracy, manslaughter, assault and robbery, and other crimes such as narcotics trafficking, money laundering and fraud in connection with a business, witness tampering, using counterfeit money and making a false statement to law enforcement. CW-1 is cooperating with the government in hopes of receiving leniency at sentencing. Information supplied by CW-1 in this and other investigations has been corroborated by, inter alia, other witnesses and documents, such as phone records and police reports.

4

Albany. CW-1 obtained that cocaine from a Supplier in Brooklyn, New York, also on consignment (the "Supplier"). The defendant JAMES CURETON was responsible for retrieving the proceeds from Brooks' Albany drug sales and providing them to CW-1 in Staten Island. Brooks, however, did not pay CW-1 and the Supplier as agreed. Brooks therefore owed the Supplier tens of thousands of dollars, a few thousand dollars of which was owed to CW-1.

    b.  In or about mid-October 2009, CW-1 travelled from Staten Island to Albany to confront Brooks and collect payment. Brooks claimed[3] that business was slow and, as a result, he did not have the money yet, and that he could not show CW-1 the narcotics that had yet to be sold because they were stored elsewhere. CW-1 then returned to Staten Island.

    c.  Approximately two weeks prior to Brooks' murder, CW-1 met with the Supplier. The Supplier provided CW-1 with $25,000 in cash at the Supplier's residence in Brooklyn, New York. The Supplier told CW-1 that CW-1 needed to take care of Brooks. CW-1 understood from their conversation that CW-1 either had to retrieve the money Brooks owed the Supplier or kill Brooks. CW-1 further understood that if he killed Brooks, he would not have to pay back the $25,000 to the Supplier. After meeting with the Supplier, CW-1 continued to call Brooks in Albany, but his calls were generally directed to voice mail. Ultimately, Brooks sent CW-1 approximately $150 in drug proceeds via Western Union.

---

[3] All statements described herein are related in sum and substance and in part.

5

    d.    On or about October 30, 2009, defendant CURETON, while in CW-1's presence, had a phone call with an individual in Albany (the "Individual"), which CW-1 heard via speaker phone. The Individual indicated that Brooks did not intend to pay the remainder of what was owed for the narcotics. After this call, defendant CURETON and CW-1 decided to murder Brooks the following day.

    e.    The next day, CW-1 and defendant CURETON travelled from Staten Island to Albany in a rental car for the purpose of killing Brooks. CW-1 was not familiar with the area of Albany, New York, but defendant CURETON was familiar with that area. CW-1 was armed with a 9-millimeter firearm; defendant CURETON was not armed but knew CW-1 had a gun. On the way to Albany, CW-1 and defendant CURETON stopped and defendant CURETON placed a call to a woman who was friends with Brooks' girlfriend. Brooks' girlfriend lived with Brooks in Albany. Defendant CURETON asked the woman to get Brooks' girlfriend out of Brooks' residence, but did not tell her why.

    f.    CW-1 and defendant CURETON then drove to the vicinity of Brooks' residence in Albany. Thereafter, CW-1 and defendant CURETON parked and approached Brooks' residence by foot. While approaching the residence, they saw an acquaintance (the "Acquaintance"). After speaking briefly with defendant CURETON, the Acquaintance left. CW-1 and defendant CURETON then proceeded to Brooks' residence. Brooks opened the door and was reluctant to let them in, but they walked in aggressively through the open door. While inside, CW-1 asked Brooks for the Western Union receipt for the small amount of money Brooks recently had sent CW-1. Brooks retrieved the receipt and provided it to CW-1. CW-1 then asked Brooks for the money Brooks owed, but Brooks said

that it was not there. CW-1 then asked for the product, indicating that Brooks had to have some of the remaining narcotics in the residence. In response, Brooks went into another room. When Brooks returned, CW-1 shot him twice, first in the neck and then in his head.

    g.  Following the murder, CW-1 and defendant CURETON drove back to Staten Island together.

    6.  Based on my review of Albany County District Attorney's Office documents and Albany County Police Department reports, I am aware that the Acquaintance[4] identified defendant CURETON to law enforcement in Albany County pursuant to an identification procedure as an individual he knew as "Q," and confirmed, in sum and substance, that he had seen defendant CURETON on the afternoon of October 31, 2009 with another individual on Eagle Street in Albany. The Acquaintance identified a photograph of CW-1 as that other individual. The Acquaintance stated that he had come to Eagle Street that afternoon to pick up Brooks but was unable to reach him, and that he spoke to defendant CURETON when he saw him.

    7.  I also have reviewed records obtained from Sprint for the cellular telephone with phone number 347-308-4956, which I am aware, based on information I have received from law enforcement authorities in Albany, is a phone defendant CURETON was using in October 2009. Based on my review of those records, I am aware that there were

---

[4] I am also aware, based on my review of Albany County District Attorney's Office documents, that the Acquaintance stated in sum and substance and in part that, after speaking to law enforcement about his interaction with defendant CURETON on October 31, 2009, the Acquaintance signed and got notarized a document containing a statement he knew to be false relevant to the investigation into Brooks' murder. The Acquaintance also has stated, in sum and substance and in part, that he knew defendant CURETON wanted him to generate such a written statement and that the Acquaintance then did so.

multiple calls between that telephone (the "Cureton Telephone") and the telephone number 845-776-0674, which I have learned was being used by CW-1, on October 30, 2009 and early in the morning of October 31, 2009.  In addition, records obtained from Sprint indicate that there were approximately four calls on October 30, 2009, the day before Brooks' murder, between the Cureton Telephone and telephone number 347-205-6157, which I have learned as part of this investigation was being used by Brooks.

8. In addition, based on information I have received regarding law enforcement authorities in Albany's review of Brooks' cellular telephone as of October 31, 2009, both defendant CURETON's and CW-1's telephone numbers were stored as contacts, with associated speed dial numbers, in Brooks' telephone.  Defendant CURETON's telephone number (347-308-4956) was stored as the contact for "Jayquan."

WHEREFORE, your deponent respectfully requests that the defendant JAMES CURETON, also known as "Jayquan" and "Q," be dealt with according to law.

*Philip Keane*
PHILIP KEANE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
10 day of August, 2015

_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK